66 F.3d 470
 Raul RODRIGUEZ and Sara Rodriguez, Plaintiffs-Appellees,
v.
R.J. PHILLIPS, Sheriff, et al. Orange County Warwick, NY;
Correctional Officer Soto, et al. Mid-Orange Correctional
Facility; et al. Mid-Orange Correctional Facility and
Alvardo Garcia, N.Y. State Trooper, Defendants,
Joseph C. Snow, Superintendent Mid-Orange Correctional
Facility; Correctional Officer Rubin, et al. Mid-Orange
Correctional Facility; Correctional Officer Epstein, et al.
Mid-Orange Correctional Facility and Lieutenant Alcock,
Defendants-Appellants.
 No. 818, Docket 94-2377.
 United States Court of Appeals,
Second Circuit.
 Argued March 15, 1995.
Decided Sept. 15, 1995.
 
 Marion R. Buchbinder, Assistant Attorney General, New York City (G. Oliver Koppell, Attorney General of the State of New York, New York City, of counsel), for defendants-appellants.
 James I. Meyerson, New York City, for plaintiffs-appellees.
 Before: MESKILL, CARDAMONE, and ALTIMARI, Circuit Judges.
 CARDAMONE, Circuit Judge:
 Unlike early English law, where according to Blackstone there existed an established rule "that the king can do no wrong," 1 W. Blackstone, Commentaries *68, our jurisprudence was nourished in different soil. It is plain that sometimes a sovereign government can do wrong. In the present appeal more than a few wrongs have been charged by plaintiffs against several state officials. In examining these allegations of wrongdoing it is our task to decide whether they set forth only a cause of action in tort arising under state law or whether they rise to the level of a constitutional deprivation.
 To succeed on a claim for violation of civil rights under 42 U.S.C. Sec. 1983, plaintiffs must show that state officials, acting under color of state law, deprived plaintiffs of a right guaranteed them by the Constitution or laws of the United States. Moreover, defendants' actions at that time must have been objectively unreasonable in light of clearly established federal law; otherwise, those actors are entitled to qualified immunity. That is what is at issue in this appeal because despite plaintiffs having raised claims of a constitutional nature, we do not believe their allegedly infringed rights were clearly established at the time of the charged offenses, or that the state officials' actions were objectively unreasonable in light of then-existing law. In sum, as our discussion will show, we think defendants are entitled to qualified immunity.
 Plaintiffs are a former prison inmate and his mother. Defendants-appellants are officials and corrections officers of a New York state prison. Of the original defendants, only four are parties to this appeal. They are Joseph C. Snow, former Superintendent of New York's Mid-Orange Correctional Facility (Mid-Orange), Lt. Frank Alcock, an officer in that facility, and Mid-Orange Correctional Officers Marvin Epstein and Fernando Rubin. Plaintiffs brought suit alleging numerous violations of their civil rights and asserting various state law claims, arising from a series of events that will be detailed shortly. When appellants moved for summary judgment, the United States District Court for the Southern District of New York (Wood, J.), in a memorandum opinion and order entered on June 21, 1994, granted the motion in part and denied it in part.
 
 BACKGROUND
 
 1
 Plaintiff Raul Rodriguez was a prisoner at Mid-Orange when his mother, Sara Rodriguez, traveled by bus from New York City to visit him on Sunday, December 30, 1990. The bus dropped her off near the prison. As Ms. Rodriguez approached Mid-Orange she apparently leaned against or touched the fence surrounding the prison, pausing there briefly before continuing on into the visitors reception area. Corrections Officer Fernando Rubin--one of the present appellants--radioed a report to officers inside the facility that he had observed Ms. Rodriguez pass a small brown package through the fence to an unidentified inmate.
 
 
 2
 Inside the prison, Sara Rodriguez was approached by one or more officers and questioned about the incident at the fence. The officers maintain she admitted passing an old pair of sneakers through the fence. Ms. Rodriguez, a 70-year old woman on heart medication, denies having said any such thing. She insists she stated she leaned on the fence because she felt dizzy. When the corrections officers told her she would be unable to visit her son that day, she left the prison and returned to the bus stop. While Ms. Rodriguez was waiting at the bus stop, Mid-Orange corrections officers came along, seized her and brought her back to the prison facility for further questioning. The state police were contacted, a complaint signed, and Ms. Rodriguez was arrested. She was taken to county court and there arraigned on a charge of promoting prison contraband in the second degree (a misdemeanor). Unable to make bail, Ms. Rodriguez was remanded to the county jail. She was released without explanation the next day. In April 1991, several months after this December 1990 incident, the case against her was adjourned in contemplation of dismissal.
 
 
 3
 Meanwhile, her son Raul's room was searched for contraband. Believing that something other than sneakers, perhaps drugs, had been passed through the fence, prison officials viewed Rodriguez as a potential safety and security risk and placed him in administrative detention pending further investigation. Plaintiff's segregation was ordered by Lt. Frank Alcock, another one of the four appellants and the prison official in charge of the investigation. The investigation involved an inspection of all public areas in the building in which Rodriguez was housed and consultation with a prison informant from that building. In addition, on each day of the three days he was segregated, Rodriguez was questioned by Lt. Alcock. The investigation yielded no results and plaintiff was released from administrative confinement on January 2, 1991, having been so confined for three days. No disciplinary charges were filed against him.
 
 
 4
 Initially, Superintendent Snow, a third appellant, did not act to suspend Sara Rodriguez' visitation rights with her son. On January 12, 1991 she again traveled by bus to visit Raul, this time accompanied by another son, Ivan. Recognizing Ms. Rodriguez, Corrections Officer Marvin Epstein, the fourth and final appellant, inquired of his supervisor whether she should be allowed to visit her son. He was instructed not to permit her to visit and to require her to leave the premises, although Ivan might remain and visit his brother. Ms. Rodriguez maintains that when she arrived, Officer Epstein screamed at her, put both hands on her shoulders, propelled her toward the building entrance and threw her against the front door. Appellant Epstein denies that any physical contact occurred with Ms. Rodriguez. Ivan persuaded the officers to permit his mother to wait inside the building while he visited Raul. Two days later prison officials sent a letter to Sara Rodriguez, formally advising her that her visitation privileges had been suspended during the pendency of the criminal charges against her. When those proceedings were terminated in April 1991, her visitation privileges were restored.
 
 
 5
 On July 16, 1991 Raul and Sara Rodriguez brought suit pro se against numerous defendants, including besides appellants various state prison officials and corrections officers, and other state and county officers. Later, after having obtained the benefit of counsel, plaintiffs amended their complaint. In a second amended complaint, plaintiffs alleged violations of their constitutional and state law rights resulting from Sara Rodriguez' arrest, the denial of visitation rights, the administrative detention of Raul Rodriguez, and the use of excessive force on Sara Rodriguez. Plaintiffs sought injunctive and declaratory relief as well as compensatory and punitive damages.
 
 
 6
 After discovery was completed, defendants moved for summary judgment. The magistrate judge, to whom the case was referred, issued a report and recommendation recommending that the motion be granted in part and denied in part. Both sides filed objections. After considering the motion de novo, the district judge adopted, with modifications, the report and recommendation. The result, in relevant part, was that appellants' motion for summary judgment was denied in the following respects: (1) Sara Rodriguez' civil rights claim based on Officer Epstein's alleged use of excessive force on January 12, 1991, (2) Raul Rodriguez' civil rights claims that his administrative confinement was in retaliation for the exercise of his First Amendment rights, and (3) that his due process rights were violated by his being held in administrative confinement for three days without an opportunity to be heard, (4) both plaintiffs' request for declaratory relief relating to their visitation rights that were suspended by Superintendent Snow, and (5) state law claims of false arrest and defamation against Officer Rubin and battery against Officer Epstein.
 
 
 7
 From these recited denials of their motion, the four named appellants appealed.
 
 DISCUSSION
 I Qualified Immunity
 
 8
 The central issue raised on this appeal is whether appellants Epstein, Rubin and Alcock are protected by the doctrine of qualified immunity. Appellant Snow, having been granted qualified immunity as to plaintiffs' visitation rights claim, does not join in this aspect of the appeal.
 
 
 9
 The doctrine of qualified immunity attempts to balance the strong policy of encouraging the vindication of federal civil rights by compensating individuals when those rights are violated, with the equally salutary policy of attracting capable public officials and giving them the scope to exercise vigorously the duties with which they are charged, by relieving them from the fear of being sued personally and thereby made subject to monetary liability. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 806-07, 813-14, 102 S.Ct. 2727, 2732, 2735-36, 73 L.Ed.2d 396 (1982); see also Weaver v. Brenner, 40 F.3d 527, 532 (2d Cir.1994). The doctrine shields government officials from liability for damages on account of their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. This protection turns on the " 'objective legal reasonableness' " of the allegedly unlawful official action "assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39).
 
 
 10
 Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity. See Cartier v. Lussier, 955 F.2d 841, 844 (2d Cir.1992); see also Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. Summary judgment is particularly appropriate when the qualified immunity defense is based on a showing that an asserted right was not clearly established since the inquiry as to whether a right was or was not clearly established is "solely a question of law," Weaver, 40 F.3d at 533.
 
 
 11
 Summary judgment may also be available when, even though plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the action complained of, it was nonetheless "objectively reasonable" for the defendant official "to believe that his acts did not violate those rights." Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987). To be entitled to summary judgment on this ground the defendant official must produce such uncontroverted facts that a jury--drawing all inferences favorable to plaintiff--would have to conclude it was objectively reasonable for defendant to believe his actions did not violate an established federally protected right. See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.1993).
 
 
 12
 While denial of summary judgment ordinarily is not immediately appealable, it is well settled that the rejection of the qualified immunity defense is immediately appealable under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), to the extent such defense may be established as a matter of law. See Weaver, 40 F.3d at 533; Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir.1993). Where the presence of this defense depends upon the resolution of disputed factual issues, an immediate appeal does not lie. See Kaminsky v. Rosenblum, 929 F.2d 922, 926 (2d Cir.1991). This dichotomy--between denials of summary judgment on legal questions, which are immediately appealable, and denials based on the existence of triable issues of fact, that are not--has recently been reinforced by the Supreme Court in Johnson v. Jones, --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
 
 
 13
 In Johnson, the Court stated "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources, argue in favor of limiting interlocutory appeals of 'qualified immunity' matters to cases presenting more abstract issues of law," id. at ----, 115 S.Ct. at 2158, and prohibiting interlocutory appeals insofar as the district court "determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial," id. at ----, 115 S.Ct. at 2159. Johnson does not disturb the rule that whether a disputed fact is material is a question of law and therefore, in the qualified immunity context, a finding of materiality is subject to prompt de novo review. See Weaver, 40 F.3d at 533.
 
 
 14
 In determining whether a right was clearly established at the time defendants acted, we examine whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful. See Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir.1991), cert. denied, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).
 
 
 15
 We now review in turn each of plaintiffs' claims to determine whether a clearly established right was violated, or whether any disputed factual issues identified by the district court are material to the resolution of defendants' qualified immunity defense.
 
 A. Excessive Force
 
 16
 Sara Rodriguez alleges that on her January 12, 1991 prison visit Officer Epstein threw her forcefully against a door. Epstein denies that any physical contact occurred. The magistrate judge's report concluded that, as Ms. Rodriguez was neither an arrestee nor an inmate, the allegation of excessive force implicated neither the Fourth nor Eighth Amendments. But, the report concluded, plaintiff's allegation did implicate the right to substantive due process under the Fourteenth Amendment. It found there were triable issues of fact as to whether the force used by Epstein, if any, was excessive. The district court agreed with these findings and, it continued, while neither the Supreme Court nor this Court had ruled on whether a substantive due process right to be free from excessive force survived Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), it believed such a claim was actionable. It determined further that this right was clearly established when the alleged force was used. Epstein's argument that, even if excessive force had been applied, he was entitled to qualified immunity was accordingly rejected. Epstein now raises the same qualified immunity contention on appeal.
 
 
 17
 A common law tort does not give rise to a Sec. 1983 action unless the commission of the tort also violates a right guaranteed plaintiff under the Constitution or federal statute. Cook v. Sheldon, 41 F.3d 73, 77 (2d Cir.1994); Bryant v. Maffucci, 923 F.2d 979, 983 (2d Cir.1991). And, even if the tort results in such a violation, plaintiff will not recover if defendants are entitled to qualified immunity because the federal right was not clearly established. Cook, 41 F.3d at 77-78. Thus our task is twofold: we must determine what federal right was violated by the alleged use of excessive force, and whether that right was so clearly defined at the time of the offense as to defeat a claim for qualified immunity.
 
 
 18
 The difficulty in this excessive force case arises from the fact that--as the district court correctly held--it falls outside the seizure and confinement contexts protected by the Fourth and Eighth Amendments. While the right of an individual not to be subjected to excessive force in any context is "clearly established" in the conventional sense, the inquiry cannot be framed in such general terms. See Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir.1990). The Supreme Court teaches that the facts and circumstances of each case must be examined to determine whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. Thus, we must determine whether in January 1991 the right to be free from the use of excessive force was so clearly defined in this non-seizure, non-prisoner context that defendant Epstein knew his actions were unlawful.
 
 
 19
 Earlier in our jurisprudential history, the contours of this right were clearly defined. All excessive force claims were analyzed under a single substantive due process standard: "quite apart from any 'specific' of the Bill of Rights," application of excessive force would be viewed in any context as a deprivation of due process where the government official's conduct "shock[ed] the conscience." Johnson v. Glick, 481 F.2d 1028, 1032-33 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).
 
 
 20
 After Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 the viability of Johnson's substantive due process analysis of excessive force has in most cases not survived. In Graham, the Supreme Court turned from the use of the single "shocks the conscience" standard applicable to all excessive force claims brought under Sec. 1983. It ruled instead that excessive force claims must be examined under the standard applicable to the specific constitutional right allegedly violated, which in most instances will be the Fourth or Eighth Amendments, the main sources of individual protection under the Constitution against physically abusive official conduct. See 490 U.S. at 393-94, 109 S.Ct. at 1870-71. Since Graham arose in the context of a person's seizure by police officers, the excessive force claim in that case was governed by Fourth Amendment objective reasonableness standards. See also Finnegan, 915 F.2d at 818, 822-23 (applying the Fourth Amendment's objective reasonableness test to a claim of excessive force by a law enforcement officer in effecting an arrest).
 
 
 21
 Graham thus seemed to call into question whether Fourteenth Amendment substantive due process survived as a source of a federal right to be free from excessive force. One reading of Graham suggests such protection does not survive, and that those relatively unusual excessive force cases falling beyond the ambit of the Fourth and Eighth Amendments are redressable only by recourse to state tort law. We do not think such a reading is correct. Rather, we believe Graham leaves the law untouched in that narrow area, and in the non-seizure, non-prisoner context, the substantive due process right to be free from excessive force is alive and well.
 
 
 22
 Those of our sister circuits that have addressed this point have shared our view that this right survives despite temporarily having been rendered uncertain by Graham. See Bella v. Chamberlain, 24 F.3d 1251, 1257 (10th Cir.1994) ("Without deciding the issue, we assume that excessive force claims arising outside the context of a seizure still may be analyzed under substantive due process principles." (emphasis added)), cert. denied, --- U.S. ----, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir.1993) (holding, as a matter of first impression in the circuit, that a Fourteenth Amendment excessive force claim survives Graham when there is no seizure); Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir.1990) ("We assume that claims of excessive force outside the context of a seizure still may be analyzed under substantive due process principles." (emphasis added)); Braley v. City of Pontiac, 906 F.2d 220, 225 n. 5 (6th Cir.1990) (noting that Graham "calls into question the continued existence of this 'species' of substantive due process, at least insofar as it exists apart from any specific of the Bill of Rights"); Pleasant v. Zamieski, 895 F.2d 272, 276 n. 2 (6th Cir.) (despite Graham's broad phasing, presumably substantive due process analysis preserved for non-seizure excessive force claims), cert. denied, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990).
 
 
 23
 Our silence and that of the Supreme Court on the continued viability of Fourteenth Amendment excessive force actions after Graham, together with the recited decisions of our sister circuits, demonstrate that any federal right of a non-arrestee/non-prisoner to be free from excessive force was not clearly established at the time of Epstein's alleged actions. While we now read the 1989 Graham decision not to preclude a claim such as Ms. Rodriguez', we agree with the Eleventh Circuit's comment that Graham "forecloses any contention that the law was clearly established in 1990 and 1991 that use of excessive force violated the Due Process Clause." Swint v. City of Wadley, 51 F.3d 988, 1000-01 (11th Cir.1995). Since, in January 1991, Sara Rodriguez did not have a clearly established substantive due process right to be free from use of excessive force, Officer Epstein is entitled to qualified immunity on this cause of action and the denial of summary judgment in his favor was error.B. Retaliation for the Exercise of First Amendment Rights
 
 
 24
 Officer Rubin reported on December 30, 1990 that he saw Sara Rodriguez pass contraband through the prison fence to an unknown inmate. This report resulted in Raul Rodriguez' placement in administrative segregation pending an investigation. Plaintiff alleges that Officer Rubin fabricated the accusation as a means of retaliating against him for an earlier episode where plaintiff verbally defended an inmate whom Rubin was disciplining. According to Rodriguez, during February or March 1990, he had a verbal confrontation with Officer Rubin. "[H]e [Rubin] was trying to implement something on another inmate. So being that I saw that the inmate couldn't defend himself, I approached and excuse [sic] myself and told [Rubin] that according to institutional policy that was wrong what he was doing." As a result of this incident, Rodriguez believed Rubin and his fellow officers had a "grudge" against him.
 
 
 25
 The district court noted that state regulations prohibit inmates from verbally obstructing or interfering with a prison employee at any time, see 7 N.Y.C.R.R. Sec. 270.2(B)(8)107.10, and that if plaintiff violated this prohibition, no First Amendment claim would lie. Nevertheless, it decided that disputed issues of fact existed regarding Officer Rubin's allegedly retaliatory intent in making the report and whether Rodriguez' remarks on the earlier occasion violated the prohibition against verbal interference. Accordingly, the trial court held these triable issues precluded granting summary judgment on qualified immunity grounds.
 
 
 26
 Although the "filing of unfounded charges d[oes] not give rise to a per se constitutional violation actionable under section 1983," Freeman v. Rideout, 808 F.2d 949, 953 (2d Cir.1986), cert. denied, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), we have held that a Sec. 1983 claim may stand when the false charges are allegedly brought in retaliation for an inmate's exercise of his substantive constitutional rights, see Franco v. Kelly, 854 F.2d 584, 589-90 (2d Cir.1988). Thus, assuming that Officer Rubin made a false report in retaliation for plaintiff's remarks, we must inquire whether Raul Rodriguez was exercising his clearly established First Amendment rights in making the remarks.
 
 
 27
 Although an inmate's constitutional protections are not left at the prison gate, see Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989), "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). A prison inmate retains only those First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). As a result, many prison policies restricting inmates' First Amendment rights are upheld, although the same policies would not be permissible outside a prison's walls. See Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir.1995).
 
 
 28
 The district court believed that whether plaintiff's speech was protected by the First Amendment hinged upon whether or not that speech violated the regulation barring verbal obstruction or interference with prison personnel. However, the First Amendment and the relevant prison regulation are not coterminous. Even if Rodriguez' action--approaching and speaking out against a corrections officer when the officer is at that very moment engaged in disciplining another inmate--is not viewed as obstructing or interfering with a corrections officer, it does not follow that the First Amendment protects his speech in that context. As noted above, the First Amendment is subject to severe curtailment when its protections are inconsistent with the limitations inherent in incarceration, especially those limitations necessary for the safety and security of the prison environment.
 
 
 29
 We need not determine the precise contours of the First Amendment's protections under these circumstances. Because our inquiry is only whether the right allegedly violated was or was not clearly established, we need only determine whether pre-existing law sufficiently foreshadows the direction it will take such that government officials have reasonable notice of the illegality of their actions. While case law establishes that prisoners retain limited First Amendment rights, no case offers any suggestion that the First Amendment may trample the concerns of safety and security that are paramount in the prison setting. In the context of the confrontation described in Rodriguez' own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin. We conclude, therefore, that even if Rubin's actions were in retaliation for that exchange, the corrections officer still was entitled to qualified immunity and the district court wrongly denied his motion for summary judgment on this cause of action in plaintiffs' complaint.
 
 
 30
 C. Procedural Due Process and Administrative Segregation
 
 
 31
 Raul Rodriguez contends that his detention in administrative segregation for three days without an opportunity to be heard violated his right to procedural due process. Lt. Alcock was the prison official responsible for the investigation into the alleged passage of contraband by Sara Rodriguez and for Raul's detention. Lt. Alcock avers that daily questioning provided Rodriguez with an opportunity to be heard and that, even if it did not, a three-day detention pending an investigation without such an opportunity was reasonable. The district court determined that both these defenses required the resolution of disputed facts that precluded granting summary judgment on qualified immunity grounds. Implicit in the district court's discussion was that Rodriguez had a protected liberty interest in remaining free from administrative confinement. In light of recent Supreme Court case law, we examine this assumption more closely.
 
 
 32
 To benefit from the procedural protections of the Fourteenth Amendment, one must be deprived of a liberty interest protected by that Amendment. The Due Process Clause itself does not confer on inmates a liberty interest in being confined in the general prison population, rather than the more restrictive administrative segregation. See Hewitt v. Helms, 459 U.S. 460, 466-68, 103 S.Ct. 864, 868-70, 74 L.Ed.2d 675 (1983). This is because of the broad administrative and discretionary authority afforded prison officials and the necessarily narrow range of protected liberty interests retained by those incarcerated. See id. at 467-68, 103 S.Ct. at 869-70.
 
 
 33
 In Hewitt the Supreme Court expressed its belief that Pennsylvania had created a protected due process liberty interest in remaining free from administrative confinement. See id. at 469-72, 103 S.Ct. at 870-72. This analysis was based on the state's use in its prison regulations of "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates." Id. at 471-72, 103 S.Ct. at 871-72. We have consistently applied this method of analysis to hold that New York has created a liberty interest in remaining free from administrative confinement. See Russell v. Coughlin, 910 F.2d 75, 77 (2d Cir.1990); Gittens v. LeFevre, 891 F.2d 38, 40 (2d Cir.1989); see also Wright v. Smith, 21 F.3d 496, 498-99 (2d Cir.1994).
 
 
 34
 After oral argument in this case, and while decision was pending, the Supreme Court revisited the question of when state prison regulations confer on inmates a protected liberty interest, and disavowed the analysis used in Hewitt. See Sandin v. Conner, --- U.S. ----, ---- - ----, 115 S.Ct. 2293, 2297-2300, 132 L.Ed.2d 418 (1995). While acknowledging that states might still create protected liberty interests, the Court stated, "these interests will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at ----, 115 S.Ct. at 2300. The Court then applied the test as follows:
 
 
 35
 Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.
 
 
 36
 This case, though concededly punitive, does not present a dramatic departure from the basic conditions of [plaintiff's] indeterminate sentence.... We hold that [plaintiff's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.
 
 
 37
 Id. at ----, 115 S.Ct. at 2301. Thus, Sandin may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation. For purposes of the present appeal, however, we need not resolve whether Rodriguez had a protected liberty interest under the new Sandin standard. For we believe that even if he did, it was objectively reasonable for Lt. Alcock to believe Rodriguez had received all the process he was due.
 
 
 38
 Assuming the existence of a liberty interest, due process requires that an inmate confined to administrative segregation must be afforded "some notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation." Hewitt, 459 U.S. at 476, 103 S.Ct. at 873-74. This requirement may be satisfied by "an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wishe[s] to submit, within a reasonable time after confining him to administrative segregation." Id. at 472, 103 S.Ct. at 872. What is a "reasonable time" must "tak[e] into account the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials." Id. at 476 n. 8, 103 S.Ct. at 874 n. 8.
 
 
 39
 In the instant case, Rodriguez was given notice at the time of his administrative confinement that it was due to the report of his mother passing an unknown object through the prison fence to an unknown inmate. Lt. Alcock contends that his questioning of Rodriguez on each day of plaintiff's confinement satisfied the requirement that Rodriguez have an opportunity to be heard on whether segregation was appropriate. We agree with the district court that a question exists as to whether Lt. Alcock's questioning of Rodriguez allowed plaintiff an opportunity to be heard, and, were this issue determinative, we would affirm the denial of summary judgment.
 
 
 40
 But due process is violated only when the opportunity to be heard is not provided within a reasonable time of the commencement of administrative segregation. Hence, if it would have been reasonable to provide that opportunity after the third day of confinement, the point at which Rodriguez was released, the dispute as to whether he was heard before that time is not material. Moreover, if it was objectively reasonable for Lt. Alcock to believe that such was the case, qualified immunity is warranted.
 
 
 41
 In Hewitt, the Supreme Court held a five-day period between placement in administrative segregation and an opportunity to be heard was reasonable. It noted prison security is a matter best left to the discretion of prison officials, that in the prison context rumor or reputation is enough to create a security risk until it is disproved, and that the progress of the investigation will play a role in prison administrators' decisionmaking. See 459 U.S. at 474, 477 n. 9, 103 S.Ct. at 872-73, 874 n. 9. None of our decisions has established what constitutes the minimum time within which a hearing on administrative confinement must be held. See Green v. Bauvi, 46 F.3d 189, 195 (2d Cir.1995); see also Russell, 910 F.2d at 79 ("The Helms 'reasonable time' standard admittedly does not fix a precise time period within which state officials must act."). Although we found a due process violation in Matiyn v. Henderson, 841 F.2d 31 (2d Cir.), cert. denied, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988), where four days had passed between the inmate's confinement and release, in that case Matiyn had not been given notice of the reason for his segregation. See id. at 33, 36. Again, we found a seven-day delay to violate due process in Gittens, but affirmed dismissal on the ground of qualified immunity, stating that "Helms made clear that three days was not the outer boundary of reasonableness." 891 F.2d at 42.
 
 
 42
 Raul Rodriguez was segregated because Lt. Alcock perceived the situation as creating a threat to the security and safety of the prison. The public spaces of the cell-block were searched and at some point a prisoner-informer was interviewed by Lt. Alcock. Plaintiff was questioned each day of his confinement. Although the magistrate judge believed this could all have been accomplished in one day, we are not prepared to dictate how investigations are to be performed by prison officials. They have unique expertise as to how long information needs to be disseminated before informers are aware of it, how long after being placed in segregation inmates are likely to admit their violation of rules, and how long it takes before rumors of contraband will subside such that the alleged recipient will not come under attack from fellow inmates. Under these circumstances, and in light of the above discussed decisions, it was objectively reasonable for Lt. Alcock to believe Rodriguez' three-day administrative confinement, without an opportunity to be heard, did not violate plaintiff's Fourteenth Amendment due process rights. Denial of Lt. Alcock's motion on this issue for summary judgment on qualified immunity grounds must therefore be reversed.
 
 II Declaratory Relief
 
 43
 Both plaintiffs--mother and son--maintain that the suspension of Sara's visitation rights by Superintendent Snow was done without proper notice and a hearing, in violation of their right to procedural due process. Plaintiffs sought damages, an injunction and declaratory relief. The magistrate judge examined the regulations pertaining to visitation and found that plaintiffs had a protectable liberty interest. While appellant does not challenge this conclusion--accepted by the district court--again, it appears questionable in light of the Supreme Court's recent decision in Sandin v. Conner, --- U.S. ----, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), discussed above.
 
 
 44
 Nonetheless, we need not now resolve this issue. The magistrate judge determined that appellant Snow was entitled to summary judgment on the damages claim based on qualified immunity because it was objectively reasonable for him to believe he was providing all the process that was due. Because the claim for injunctive and declaratory relief could be viewed as a claim against Superintendent Snow in his official capacity, in which case qualified immunity does not apply, the magistrate judge recommended that summary judgment be denied as to that part of the claim. He also noted that this cause of action was justiciable due to Rodriguez' continued incarceration.
 
 
 45
 In plaintiffs' exceptions to the magistrate judge's report and recommendation, they informed the district court that Raul Rodriguez was no longer an inmate at Mid-Orange or any other New York State prison facility. In response, appellant Snow, in his exceptions to the report, requested that the claim for injunctive relief be dismissed as moot. In adopting the magistrate judge's recommendation, the district court granted summary judgment on qualified immunity grounds as to the damages claim, dismissed the claim for an injunction as moot, and denied summary judgment as to the claim for declaratory relief. Superintendent Snow now appeals the denial of summary judgment from plaintiffs' request for a declaratory judgment on two grounds. If, as the magistrate judge concluded, the suit is against him in his official capacity, Snow avers summary judgment should be granted under the Eleventh Amendment. Alternatively, he continues, the request for declaratory relief fails to state a claim or controversy and should be dismissed for lack of subject matter jurisdiction.
 
 
 46
 In making these arguments, appellant Snow makes no mention as to whether we have jurisdiction to hear his interlocutory appeal. Although we had jurisdiction under the collateral order doctrine to entertain the appeals of Epstein, Rubin and Alcock due to the denial of qualified immunity, Snow's appeal is on a different ground--in fact he prevailed below on his qualified immunity claim. "[T]he mere fact that a district court's order includes a denial of qualified immunity does not mean that all issues addressed in that order are immediately appealable. To be appealable the parts of a summary judgment order addressing other issues must independently meet the requirements of the Cohen v. Beneficial Industrial Loan Corporation ... test." Swint v. City of Wadley, 51 F.3d 988, 1002 (11th Cir.1995), on remand from Swint v. Chambers County Comm'n, --- U.S. ----, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (reversing the Eleventh Circuit's exercise of pendent party appellate jurisdiction to reach the claim of a party who was denied summary judgment where other appellants were appealing the denial of summary judgment of qualified immunity grounds). Because the denial of appellant Snow's summary judgment motion from the declaratory judgment claim was not based on qualified immunity, the exception that allows us to hear immediately the appeals of appellants Epstein, Rubin, and Alcock does not apply to appellant Snow.
 
 
 47
 If, as the district court concluded, this claim is against Snow in his official capacity, it implicates the concerns of the Eleventh Amendment and the denial of summary judgment is immediately appealable. See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, ---- - ----, 113 S.Ct. 684, 687-89, 121 L.Ed.2d 605 (1993). On the other hand, if the claim is merely one against appellant in his personal capacity, his claim that no case or controversy exists is effectively reviewable on appeal after trial and no interlocutory appeal is available. Cf. Digital Equipment Corp. v. Desktop Direct, Inc., --- U.S. ----, ---- - ----, ---- - ----, 114 S.Ct. 1992, 1995-96, 1998-99, 128 L.Ed.2d 842 (1994) (allowing immediate appeals of every claim that would entitle a party to pretrial dismissal would swallow the narrow exception to the general rule of a single appeal from final judgment). Thus, our appellate jurisdiction depends on the capacity in which Snow was sued.
 
 
 48
 Where, as here, doubt may exist as to whether an official is sued personally, in his official capacity or in both capacities, the course of proceedings ordinarily resolves the nature of the liability sought to be imposed. See Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); see also Pride v. Does, 997 F.2d 712, 715 (10th Cir.1993); Yorktown Medical Laboratory, Inc. v. Perales, 948 F.2d 84, 88-89 (2d Cir.1991). An examination of the substance of the complaint and the course of proceedings here reveals that Snow was being sued only in his personal capacity. First, the complaint seeks punitive damages, which are not available against the state. See Pride, 997 F.2d at 715; Yorktown Medical Laboratory, Inc., 948 F.2d at 89; Shabazz v. Coughlin, 852 F.2d 697, 700 (2d Cir.1988). Second, appellant's summary judgment motion is on qualified immunity grounds, a defense unavailable in official capacity suits, and does not raise the Eleventh Amendment, which further suggests that this was viewed by the parties only as a personal capacity suit. See Pride, 997 F.2d at 715; Yorktown Medical Laboratory, Inc., 948 F.2d at 89; Shabazz, 852 F.2d at 700. Third, appellant Snow is no longer employed as the superintendent of Mid-Orange or as a New York state employee, and the fact that plaintiffs maintained their suit against him rather than substituting the current Superintendent of Mid-Orange strongly suggests that the suit is against him only in his personal capacity. See Pride, 997 F.2d at 716.
 
 
 49
 Hence, we lack jurisdiction over Snow's interlocutory appeal and it must be dismissed. In light of our conclusion that plaintiffs' suit against Superintendent Snow is against him only in his personal capacity, the district court on remand should determine whether or not this action is moot or may go forward. See Browning Debenture Holders' Comm. v. DASA Corp., 524 F.2d 811, 817 (2d Cir.1975) (where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed"); see also Christopher P. by Norma P. v. Marcus, 915 F.2d 794, 802 (2d Cir.1990) ("A litigant may not use the declaratory judgment statute to secure judicial relief of moot questions."), cert. denied, 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991).
 
 III State Law Claims
 
 50
 The district court exercised its supplemental jurisdiction over state law claims of false arrest, battery, and defamation. See 28 U.S.C. Sec. 1367(a) (Supp.III 1991). As noted above, our jurisdiction over an interlocutory appeal does not necessarily provide us with jurisdiction to hear all the issues decided by the district court. While some of the state law claims may be sufficiently intertwined with the qualified immunity claims to allow us to exercise our pendent appellate jurisdiction, such exercise is discretionary, see Kaluczky v. City of White Plains, 57 F.3d 202, 206-07 (1995), and we decline to exercise it here. As a consequence, the interlocutory appeal from the denial of summary judgment on the state law claims is dismissed.
 
 CONCLUSION
 
 51
 In sum, we remand to the district court to grant appellants' motions for summary judgment on qualified immunity grounds as to the damages claims against Epstein (excessive force), Rubin (retaliation for the exercise of First Amendment rights) and Alcock (procedural due process). Appeal from the denial of summary judgment with respect to plaintiffs' claim for declaratory relief against appellant Snow (suspension of visitation privileges) and with respect to plaintiffs' state law claims against appellants Rubin and Epstein is dismissed for lack of appellate jurisdiction.
 
 
 52
 Reversed and remanded, in part, dismissed, in part.