150 F.3d 164
 Joanne MEDEIROS, Individually and as Administratrix of
Estate of Joshua Sawicki, Plaintiff-Appellant,
v.
Shawn O'CONNELL, Jack Drumm, Samuel Izzarelli, Robert Hart,
David Brundage, Michael Demaio, Ronald Bastura,
Richard Wheeler, John Duly, and John
Rearick, Defendants-Appellees.
 No. 97-7355.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 25, 1997.
Decided July 15, 1998.
 
 Kerin Margaret Woods, Anderson & Ferdon, P.C., Norwich, CT, for Plaintiff-Appellant.
 Stephen R. Sarnoski (Richard Blumenthal, Attorney General, Hartford, CT, of counsel), for Defendants-Appellees.
 Before: WALKER and JACOBS, Circuit Judges, and BRIEANT, District Judge.*
 JACOBS, Circuit Judge:
 
 
 1
 Joshua Sawicki was a teenager riding in a school van that was commandeered by an armed robber who was being pursued by the state police. Joshua was held hostage, together with the driver and another schoolchild, until the robber was shot dead by a state trooper. One bullet, fired by the same trooper, ricocheted off a metal part of the van interior and injured Joshua. Joshua died fifteen months later, although the parties disagree as to whether his death is attributable to the stray bullet or other causes. Appellant Joanne Medeiros brought suit, in her individual capacity and as administratrix of Joshua's estate, against the police officers who rescued her son, seeking damages under 42 U.S.C. § 1983 for violations of Joshua's Fourth and Fourteenth Amendment rights.
 
 
 2
 As to the Fourth Amendment claim, we affirm the grant of summary judgment in favor of defendants on the ground (stated by the district court) that Joshua had not been seized within the meaning of the Amendment. As to the Fourteenth Amendment claim, the district court dismissed on the ground that the defendants, all of whom are Connecticut state troopers, are entitled to qualified immunity. We affirm the dismissal of the Fourteenth Amendment claim, but in light of authority that post-dates the district court's opinion, we do so on other grounds.
 
 BACKGROUND
 
 3
 On January 11, 1993, Dwight Pink visited a Ford dealership in East Lyme, Connecticut, and went with a salesman to test drive a 1990 Mustang. Pink shot and robbed the car salesman, who was found wandering along Interstate 95 by a passing motorist. The motorist notified the state police about the shooting and Pink's flight in the stolen Mustang.
 
 
 4
 A bulletin describing Pink and the stolen car was dispatched to all Connecticut state police. About an hour later, Trooper Jack Drumm (a defendant) saw the Mustang on Route 82 in East Haddam, Connecticut, and gave pursuit. Pink lost control of the car, ending up in a ditch near an intersection in East Haddam. Drumm emerged from his car and ordered Pink to throw down his gun and surrender. Pink responded by firing several shots at Drumm. Drumm took cover but did not return fire because he saw that a school van was approaching the intersection.
 
 
 5
 Pink also noticed the school van; he shoved his gun against the van's windshield and screamed, "I'll kill you, I'll kill you!" Pink then boarded the van and took hostage the driver and her two teenaged passengers. A gun to her head, the driver obeyed Pink's order to drive away.
 
 
 6
 Trooper Drumm followed and radioed for assistance; Pink repeatedly fired at him. Other state troopers, including the remaining defendants, joined a procession of vehicles that passed through several rural towns. Pink continued to fire on the troopers, repeatedly threatened to kill the hostages, and periodically held his gun to the driver's head. The troopers held their fire to avoid hurting hostages. Pleas to Pink to release the hostages were unsuccessful.
 
 
 7
 As ordered by radio, the troopers at first allowed the van to proceed unmolested; but as the van approached a more populated area, the troopers were ordered to halt the van at the intersection of Routes 66 and 17, a still-rural area where the road widened from two lanes to four with a grassy median. As the van neared the roadblock, Pink continued to shoot at the troopers and ordered the driver to evade the police cars. She obeyed by driving up the median and continuing westbound on Route 66.
 
 
 8
 The ranking officer on the scene, Sergeant Duley, then ordered the troopers to "take out" the van. This order meant that the troopers were to stop the van by blocking or ramming it and to arrest Dwight Pink, using force if necessary. As Pink continued to fire on his pursuers, the troopers received an order over the radio that, for the protection of the hostages, there was to be "[n]o indiscriminate shooting!"
 
 
 9
 Trooper Brundage managed to pin the van between his cruiser and the guard rail, and Trooper Drumm blocked it from the rear. From inside the van, Pink continued to shoot at the troopers. Trooper Drumm, with Trooper Izzarelli alongside, fired at Pink through the driver's side window of the van; Trooper Hart approached the front of the van as Trooper O'Connell approached from the rear. As all the officers fired at Pink, he fell; Sergeant Duley ordered the troopers to cease fire; and they immediately obeyed.
 
 
 10
 The troopers ascertained that Pink was dead and that Joshua, who had been in the right front passenger seat, had been struck once and wounded. The troopers gave Joshua first aid while awaiting the arrival of an ambulance.
 
 
 11
 Later investigation established that O'Connell had fired five times at Pink from his position at the rear of the van. Of the rounds that struck Pink, O'Connell had fired the fatal bullet. It was also O'Connell's bullet that passed through the rear passenger seat, was deflected off a metal support bar, and continued through the front passenger seat to strike Joshua, who was leaning forward with his head under the dashboard.
 
 
 12
 O'Connell undoubtedly knew that there were three hostages in the van at the time he fired. When he approached the van, he observed the driver in the front left seat, Joshua in the front passenger seat, and Pink crouching on the floor between them. O'Connell immediately identified Pink; at roll call that morning O'Connell was informed that Pink had said he would not be taken into custody again. In the moments before O'Connell killed him, Pink had pointed his gun at the driver, at Joshua, and at Trooper Drumm. O'Connell then hoisted himself up through the rear window of the van and shot at Pink. The investigation after the shooting revealed that Pink had two shots remaining in his gun and an empty 50-round ammunition box.[1]
 
 DISCUSSION
 
 13
 We review the grant of a motion for summary judgment de novo. See Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993).
 
 A. The Fourth Amendment Claim
 
 14
 The Fourth Amendment prohibits unreasonable seizures; it is not a general prohibition of all conduct that may be deemed unreasonable, unjustified or outrageous. See Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir.1992). So the first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure. See Michigan v. Summers, 452 U.S. 692, 696, 101 S.Ct. 2587, 2590-91, 69 L.Ed.2d 340 (1981).
 
 
 15
 Seizure under the Fourth Amendment is purposeful conduct:
 
 
 16
 [A] [v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act.
 
 
 17
 Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (citations omitted). Appellant argues that Brower 's references to intention and wilfulness bear upon the deliberateness of the means employed, and that the troopers (particularly O'Connell) are liable to Joshua under the Fourth Amendment because they intentionally used their weapons. Defendants argue that the proper question is whether a claimant was the intended object of the officers' restraint or use of force, and that Joshua cannot state a claim under the Fourth Amendment because the troopers fully intended to seize Pink, but indisputably had no intention to curtail Joshua's freedom of movement.
 
 
 18
 We have not previously considered whether the accidental shooting of a hostage or innocent bystander can give rise to a claim under the Fourth Amendment, but other courts of appeal have had little trouble with the issue. In Landol-Rivera v. Cosme, 906 F.2d 791 (1st Cir.1990), the First Circuit addressed the claim of a fast-food worker who was taken hostage by an armed robber and was shot in the jaw by a bullet intended for his captor. The court quoted Brower for the principle that:
 
 
 19
 a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement ..., nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement ..., but only when there is a governmental termination of freedom of movement through means intentionally applied.
 
 
 20
 Id. at 794 (quoting Brower, 489 U.S. at 596-97, 109 S.Ct. at 1381) (emphasis and alterations in original). Applying that principle to the hostage situation, the court stated:
 
 
 21
 We reject the notion that the "intention" requirement is met by the deliberateness with which a given action is taken. A police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern.
 
 
 22
 Id. at 795 (emphasis in original). The court reversed the jury's finding of liability and award of damages to Landol-Rivera.
 
 
 23
 Similarly, in Rucker v. Harford County, 946 F.2d 278 (4th Cir.1991), cert. denied, 502 U.S. 1097, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992), the Fourth Circuit analyzed a Fourth Amendment claim brought by the father of a bystander who was killed by police officers attempting to "apprehend[ ] a madman run amok, threatening the lives of everyone in his way." Id. at 281. That particular madman, who was high on drugs, almost succeeded in killing several of the police officers who pursued him in a long chase. Officers who attempted to shoot out the tires of the fugitive's car apparently struck Rucker accidentally. Id. at 280.
 
 
 24
 The court found that Brower foreclosed Rucker's Fourth Amendment claim, rejecting the identical argument asserted here: "[Brower ] does not mean, as Rucker contends, that a seizure occurs just so long as the act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained." Id. at 281.
 
 
 25
 We endorse the logic of these cases. Joshua was never seized within the meaning of the Fourth Amendment. The Fourth Amendment "addresses misuse of power, ... not the accidental effects of otherwise lawful government conduct." Landol-Rivera, 906 F.2d at 795 (quoting Brower, 489 U.S. at 596, 109 S.Ct. at 1381) (internal quotation marks omitted) (alterations in original). The claim presented in this case vindicates no interest protected by the Fourth Amendment. So far from seeking to restrain Joshua's freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril. See Medeiros v. Town of South Kingstown, 821 F.Supp. 823, 827 (D.R.I.1993) (rejecting the Fourth Amendment claim of a passenger who asserted that he was imprisoned in the fleeing car by the police officers' high speed chase, stating that "the police did not intend to restrict the movement of the passenger by causing the driver to flee at high speeds. In fact, their intent was the exact opposite....").
 
 
 26
 This case is easily distinguished from those in which the police shoot an innocent victim mistakenly believing that he is the suspect whom they are pursuing; in such cases, the victim was indeed the object of an intentional act of seizure, even if the police were mistaken as to the victim's identity. See, e.g., Hill v. California, 401 U.S. 797, 802-05, 91 S.Ct. 1106, 1110-11, 28 L.Ed.2d 484 (1971). But where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the "unintended consequence[ ] of government action," and the governing principle is that such consequences cannot "form the basis for a fourth amendment violation." Ansley v. Heinrich, 925 F.2d 1339, 1344 (11th Cir.1991). See also City of El Centro v. United States, 922 F.2d 816, 822 (Fed.Cir.1990), cert. denied, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991).
 
 
 27
 We hold that no Fourth Amendment seizure occurred in the present case, because the police did not intend to restrain Joshua. The deflection of the bullet intended for Pink did not transform the troopers' rescue efforts on the hostages' behalf into a seizure.
 
 B. The Fourteenth Amendment Claim
 
 28
 Medeiros also asserted a substantive due process claim under the Fourteenth Amendment, alleging that the shooting of Joshua worked a deprivation of his "life, liberty or property" without due process. The district court disposed of this claim by finding that the troopers were entitled to qualified immunity. However, subsequent to the district court's opinion, the Supreme Court expressed its preference that courts address first the merits of the constitutional claims presented before turning to an analysis of qualified immunity. See County of Sacramento v. Lewis, --- U.S. ----, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question.") The district court decided the case on what was then the most expeditious ground, qualified immunity. The Supreme Court's unambiguous preference is that we consider the merits first, and that is the ground on which we affirm.
 
 
 29
 The first inquiry bearing on the merits is whether this Fourteenth Amendment claim is foreclosed by the principle that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)) (internal quotation marks omitted). The troopers argue that in this case that principle means that Medeiros is confined to a Fourth Amendment claim and cannot bring a claim under the Fourteenth Amendment. In 1995, however, this Court construed Graham to permit a narrowly drawn Fourteenth Amendment claim only in the non-seizure, non-prisoner context. Rodriguez v. Phillips, 66 F.3d 470 (2d Cir.1995). Moreover, in County of Sacramento, the Supreme Court indicated that where no seizure within the meaning of the Fourth Amendment has taken place, substantive due process analysis is appropriate. County of Sacramento, --- U.S. at ----, 118 S.Ct. at 1715; see also United States v. Lanier, 520 U.S. 259, n. 7, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997) (Graham "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). Medeiros therefore can bring a Fourteenth Amendment claim, but for reasons discussed below, that claim is doomed to fail.
 
 
 30
 The core of the concept of due process has always been an individual's freedom from arbitrary interference by the government. See Hurtado v. California, 110 U.S. 516, 527, 4 S.Ct. 111, 117, 28 L.Ed. 232 (1884) (citing Magna Carta). See also Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). Alleged abuses of the police power are sufficiently arbitrary to rise to constitutional magnitude only when the conduct at issue "shocks the conscience." County of Sacramento, --- U.S. at ----, 118 S.Ct. at 1717; see also Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (substantive due process is violated only when executive conduct "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense").
 
 
 31
 Substantive due process, enforced by section 1983, does not afford a cause of action for police negligence. See Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); Davidson v. Cannon, 474 U.S. 344, 348, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986). Further, because the police must act in high-tension situations "in haste, under pressure, and frequently without the luxury of a second chance," Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), even an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability. In the context of a high-speed chase, the Supreme Court recently ruled that where "the officer's instinct was to do his job as a law enforcement officer, not to induce ... lawlessness, or to terrorize, cause harm, or kill," County of Sacramento, --- U.S. at ----, 118 S.Ct. at 1721, the officer's conduct did not shock the conscience; he was therefore not liable under 42 U.S.C. § 1983.
 
 
 32
 The heroic and selfless conduct of the troopers in this case is the very opposite of conduct that could be said to shock the conscience. As counsel for Medeiros conceded at oral argument, another person in her place might be moved to thank the people who risked their lives to save her son from an armed madman--rather than sue them for money damages. The conduct of the troopers was not merely constitutionally acceptable, it was objectively admirable. Appellant's Fourteenth Amendment claim must therefore fail.
 
 CONCLUSION
 
 33
 The judgment of the district court is affirmed.
 
 
 
 *
 Hon. Charles L. Brieant, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In support of the reasonableness of their actions, defendants submitted a report by retired Special Agent Lanceley of the F.B.I., a hostage negotiations specialist who now runs a private consulting firm that provides advice and instruction to law enforcement agencies. According to Lanceley, negotiations with Pink were a lost cause; Pink was bent on escalating the level of violence in order to commit "suicide-by-cop"; and the lives of the hostages were in the gravest danger throughout the crisis. Lanceley concludes that the troopers' actions were necessary to reasonably safeguard the lives of the public, the hostages aboard the van, and the troopers themselves