Jeff SMITH, Plaintiff,

v.

Justin A. TAYLOR, Deputy Superintendent; Nitchke, Correctional Sergeant; J. Campany, Correctional Officer; J. Bragaw, Lieutenant; C.O. Howard; C.O. Hill; Kwiant Sherman, Correctional Officer; G. Dietterich, Recreation Supervisor Cape Vincent Correctional Facility; S. Monette, Correctional Officer at Cape Vincent Correctional Facility, Defendants.

No. 9:00–CV–1164 (LEK/DEP).

United States District Court, N.D. New York.

May 31, 2006.

Lisa Marie Robinson, Goldberg, Segalla Law Firm–Syracuse Office, Syracuse, NY, for Plaintiff.

Jeff Smith, New York, NY, pro se.

Gerald J. Rock, Office of Attorney General, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER[1]

KAHN, District Judge.

### I. Background

The United States Court of Appeals for the Second Circuit remanded this matter pursuant to a Mandate issued September 21, 2005 (Dkt. No. 65), "for further consideration" and "for a more detailed statement of the district court's reasoning" concerning Plaintiff Jeff Smith's ("Plaintiff") claim that Defendant Justin A. Taylor, *et al.*, ("Defendants") violated Plaintiff prisoner's limited constitutional right to bodily privacy, *see Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir.1992), and Department of Corrections policy, when four guards witnessed a strip frisk/search of Plaintiff, and allegedly applied physical force during the search.[2]

For discussion of the facts and prior procedural history of this case, see the Report–Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, dated May 22, 2003 (Dkt. No. 57), which was approved and adopted in its entirety by a Decision and Order of this Court dated June 23, 2003 (Dkt. No. 59), and with which familiarity will be presumed.

Defendants have submitted copies of the relevant New York State Department of Correctional Services ("DOCS") Directives and Policies (Dkt. No. 67), as ordered by this Court (Dkt. No. 66), and the parties have filed supplemental papers briefing the relevant issues (*see* Dkt. Nos. 71 & 75). A further discussion of Plaintiff's claims concerning violation of his limited constitutional right to bodily privacy, supplementing the prior written opinions of Judge Peebles and this Court, now follows.[3]

### II. Discussion

*A. Standard of Law—Summary Judgment*

As this Memorandum–Decision and Order is a continuation of the consideration of the summary judgment motions, the Court remains mindful of the relevant standards of law. Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In applying this standard, courts must "'resolve all ambiguities, and credit all factual infer-

---

1. For printed publication by the Federal Reporters.

2. Although "strip frisk/search" and "body cavity" search have been used to describe what Plaintiff underwent upon admission to the Special Housing Unit ("SHU"), it appears from the record that Plaintiff underwent a strip frisk/search, and not a cavity search. A cavity search is a separate type of search, conducted by medical personnel, and requiring explicit approval of the Superintendent or other such officer-in-charge. *See* Directive 4910 (Dkt. No. 67, Ex. 1).

3. The Court addresses only the issue of the strip frisk/search and Plaintiff's constitutional right to bodily privacy, as instructed by the Second Circuit's Mandate. Therefore, the Court does not reconsider any of Plaintiff's other claims, such as his re-arguing of the issues surrounding his having provided legal assistance to other inmates, or Plaintiff's claims that he was unnecessarily punished for having provided said legal assistance. The Court also does not revisit the issue of Defendant Howard's request for dismissal based upon lack of personal involvement.

ences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001)).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact with respect to any of the essential elements of the claim(s) of the non-moving party. *See Liberty Lobby,* 477 U.S. at 250 n. 4, 106 S.Ct. 2505. Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

Although "in actions in which one of the parties appears *pro se,* this Court is faced with the additional responsibility of granting significant liberality in how *pro se* pleadings are construed. . . . Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (Sotomayor, D.J.) (citations omitted).

*B. Standard of Law—Review of Strip Frisk/Search and Prison Regulations*

The Court in *Covino* articulated the standard that this Court will consider:

The Supreme Court has observed: "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.". . . Our method of inquiry is first to determine whether [Plaintiff] has exhibited a subjective expectation of privacy and whether society is prepared to recognize that expectation of privacy as reasonable. . . . If so, we proceed to a second inquiry in which we identify the interests asserted by the state actors for the searches and assess whether, in this particular context, these asserted interests, when balanced against the inmate's privacy expectations, sufficiently promote legitimate governmental interests in the absence of a warrant or some level of individualized suspicion justifying the search.

*Covino,* 967 F.2d at 77–78 (citing and quoting, *inter alia, Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)).

Furthermore, in discussing the case of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the *Covino* Court listed the four factors to be considered when reviewing prison regulations:

(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain

open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.... The burden is upon the prisoner to show that a challenged prison regulation is unreasonable.

*Covino,* 967 F.2d at 78–79 (citing *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254; *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989)).

### C. The Constitutionality of the Strip Frisk/Search

In its Mandate of September 21, 2005, the Second Circuit cites to its decision in *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), as holding that although prisoners enjoy fewer rights than free citizens, prisoners do still retain "a limited right to bodily privacy". *Id.* at 78; U.S.C.A. Mandate (Dkt. No. 65) at 3. However, the Court of Appeals also mentioned that *Covino* "upheld a prison regulation authorizing random body cavity searches as 'reasonably related to [the prison's] legitimate penological interests'". U.S.C.A. Mandate (Dkt. No. 65) at 3 (citing and quoting *Covino,* 967 F.2d at 79).

The prison regulation at issue in this matter is Directive 4910—"Control Of and Search For Contraband". *See* Defts' Letter Brief (Dkt. No. 67, Ex. 1). The Court has reviewed a copy of the Directive dated February 1, 1994, which Defendants submit was effective at the time of Plaintiff's strip frisk/search in July 1997. *See id.* The other regulation at issue tangentially is Directive 4933, concerning the procedure to be followed when an inmate enters SHU—but which, according to Defendants, refers to Directive 4910 when a strip frisk/search is required. *See id.* As Defendants argue, Directive 4910 has been found

to be "reasonable on its face." *See* Defts' Mem. of Law in Further Support (Dkt. No. 71) at 5; *Gonzalez v. Narcato,* 363 F.Supp.2d 486, 495 (E.D.N.Y.2005).

Furthermore, New York law permits the strip frisking/searching of inmates entering SHU, and the use of force in limited circumstances. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 305.1 (no amendments since October 1988, and current through November 2005) ("In accordance with the provisions of directives concerning 'Control of and Search for Contraband,' the following procedures will be followed in such designated special housing units. (a) Strip frisk. (1) On initial entry to an SHU [*sic* ], an inmate will be strip-frisked...."); N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.2 (no amendments since November 1991, and current through November 2005) (concerning the use of physical force; "(d) An employee shall not lay hands on or strike an inmate unless the employee reasonably believes that the physical force to be used is reasonably necessary: ... to enforce compliance with a lawful direction...."). The Rules and Regulations of the State of New York correspond with the requirements of the regulatory directives of the Department of Correctional Services. *See* Report–Rec. (Dkt. No. 57) at 15 ("7 N.Y.C.R.R. § 302.1(a) ... is implemented through DOCS Directive 4910, which governs the control of and search for contraband.").

It is, as stated above, Plaintiff's burden to show that the prison regulation is unreasonable, *see Covino,* 967 F.2d at 78–79. Plaintiff has suggested an option for an alternative search method that he submits is as effective as the search policy in effect at the prison. For instance, Plaintiff suggests use of an "electronic chair"— which is used when inmates go to and from the exercise yard or gym. *Id.* at 7. "[T]he

officer/s have the inmates sit in the chair one at a time and slowly slide-backwards in the chair and if the inmate/s has anything concealed in his anus/rectum the buzzer on the chair would sound-off thereby warning the officer/s of the inmate concealing contraband. [D]uring this procedure the inmate does not have to strip naked...." *Id.* at 7–8. However, the Court notes that the current version of 7 N.Y.C.R.R. § 302.1 (guidelines for admission procedure to SHU) states, in relevant part:

> Whenever an inmate is admitted to an SHU [*sic*], a security supervisor will be present and the inmate will: (a) Undergo a strip-frisk *followed by a hand-held metal detector and/or B.O.S.S. chair search* in accord with the provisions outlined in department directives concerning "Control of and Search for Contraband."

N.Y. Comp.Codes R. & Regs. tit. 7, § 302.1(a) (emphasis added).[4]

 Plaintiff further argues that his religious practices—he is Muslim—prohibit strip searches and prohibit the viewing of his naked body by others. *See* Plntf's Mem. of Law in Opp. (Dkt. No. 75) at 4, 9. Plaintiff submits that "the defendants should have had an alternative procedure already in place for those inmates who practice their religious faith...." *Id.* However, religion does not ultimately trump all issues in constitutional jurisprudence. The challenged governmental prison regulation is reasonable and directly related to the overwhelmingly important governmental interest of prison security. Plaintiff is not correct that he "had every right to protest

the performance of a body cavity [strip frisk/search] in defending his religious beliefs...." Plntf's Mem. of Law in Opp. (Dkt. No. 75) at 9. Reasonable regulations, that are in place for uniformity, security or other such important reasons, may restrict religious expression or practice. *See Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (in military context, Court found that Plaintiff, an Orthodox Jewish ordained rabbi, could be prohibited from wearing his yarmulke while on duty and in military uniform, although Plaintiff's religion required that Plaintiff wear said yarmulke); *Aziz Zarif Shabazz,* 994 F.Supp. at 473 ("*Hurley [v. Ward,* 549 F.Supp. 174, 184 (S.D.N.Y. 1982)] stated '[i]t is not unreasonable to require inmates to remove their clothing, including their underwear, to permit a visual inspection of the naked body.'... 'The religious tenets of the Muslims in the prison setting must give way to penological and security requirements of the prisons.'... Furthermore, the *Hurley* consent decree .... permits strip searches and strip frisks of Muslim inmates 'in those situations and under those conditions that they may be performed on other inmates.' ") (emphasis added).[5]

As Judge Peebles stated in his Report–Recommendation, "Pursuant to Directive 4910 other inmates are required to submit to strip frisks upon entering the SHU." Report–Rec. (Dkt. No. 57) at 17. The uniform regulation in *Goldman* was to be applied to all members of the military service, just as the prison strip frisk/search regulations are to be applied to all inmates who are entering SHU. And, De-

---

**4.** Although the Court does not possess the version of § 302.1 as it existed in 1997, the Court notes the current requirement that inmates, upon admission to SHU, shall undergo **both** a strip frisk **and** a search via hand-held metal detector or B.O.S.S. chair search.

**5.** Judge Peebles provides additional discussion of the *Hurley* consent decree, from an unrelated case in the Southern District of New York, in the Report–Recommendation (Dkt. No. 57, at 15–17).

fendants argue that the search in this case can be distinguished from the search in *Covino* and certain other cases based on the fact that in this case, the strip search regulations were followed because Plaintiff was being admitted to SHU. This was not a random search for contraband, but rather a search required of all those admitted to SHU. *See* Defts' Mem. of Law in Further Support (Dkt. No. 71) at 6. As now-Chief Judge Mordue, of this District, recently discussed,

> Even where an inmate holds a sincere belief that is religious in nature, his rights to free exercise of that religious belief are subject to restriction in the prison environment. "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."... The Supreme Court has accorded great deference to the determinations of prison officials and fashioned "a lesser standard of scrutiny ... in determining the constitutionality of the prison rules."... The standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is "reasonably related to legitimate penological interests."

*Keesh v. Smith,* No. 9:04 CV 0779 NAM GJD, 2006 WL 516793, at *4 (N.D.N.Y. Mar.2, 2006) (involving issues of religious practices and observances) (citing and quoting, *inter alia, Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Turner v.*

*Safley,* 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

In this case, the need for the search, especially given the factual background surrounding Plaintiff's being sent to SHU and the heightened security regulations pertaining to SHU, was significant. Furthermore, the record reflects that Plaintiff was sentenced to time in SHU for several disciplinary violations, and that Plaintiff voiced opposition to his SHU sentence and to the strip frisk/search, thus giving officers a reasonable belief that Plaintiff would resist lawful directions, and requiring the presence of additional officers [6], *see* Directive 4910(III)(G)(1)(a) (Dkt. No. 67, Ex. 1), and possibly some use of physical force or contact—all of which is in accordance with the provisions of the above-mentioned regulations. Plaintiff admits in his Amended Complaint and elsewhere that he protested when officers told him to follow the strip frisk/search procedure, and Plaintiff also states that, at most, officers physically turned him around to face the wall and placed a hand on his neck or shoulder. *See* Amended Complaint (Dkt. No. 9) at ¶ 2; Plntf's Resp. to Defts' Replacement 7.1(a)(3) Statement (Dkt. No. 55) at ¶¶ 19, 21. But, Plaintiff does not allege that the officers touched his body in any other places, and in fact Plaintiff actually states that the officers told Plaintiff to manipulate his own body parts, as the regulations require, so that the officers could perform the inspection of Plaintiff's body. *See id.* The Defendants have denied using physical force during the strip frisk/search, but have stated that even if said force was used, it was justifiable, rea-

---

**6.** Plaintiff argues that four officers is no better than ten or fifteen officers viewing the same search, and that the excessive number of officers present violated his constitutional rights. Plntf's Mem. of Law in Opp. (Dkt. No. 75) at 10. The Court disagrees. Ten or fifteen officers would, indeed, be excessive. Four officers (in essence two additional officers pursuant to the Directives) is not. Four officers (including a Sergeant, *see* Amended Complaint (Dkt. No. 9) at ¶ 2) represents a reasonable response of prison officials to an anticipated problem with processing an inmate for entry into SHU.

sonable and not excessive. *See* Answer (Dkt. No. 27) at ¶ 1; Defts' 7.1(a)(3) Statement (Dkt. No. 51) at ¶ 2; Defts' Replacement 7.1(a)(3) Statement (Dkt. No. 54) at ¶¶ 19–21; Defts' Mem. of Law in Further Support (Dkt. No. 71) at 5–6 & n. 4.

Even assuming, *arguendo*, that limited force/bodily contact between the officers and Plaintiff occurred, the Court finds that the force used was, indeed, reasonable and not excessive, illegal or unconstitutional.[7]

Furthermore, although Plaintiff has attempted to establish an expectation of privacy for success in challenging the strip frisk/search itself, the Court finds that his expectation was not an expectation that society would be willing to accept as reasonable, especially upon entrance to SHU, given the numerous New York rules and regulations passed on behalf of the People of the State. In addition, the Government has satisfied the four-factor test from *Safley*. First, the prison search policy bears a direct and rational relationship to the Government's interest in having secure prisons, free of weapons, drugs and other such contraband—especially in SHU, where inmates are placed when they continue to have disciplinary problems. Second, it is not reasonably possible to accommodate Plaintiff's asserted right without creating a situation that would certainly have an unreasonable impact upon guards and other inmates—since it would be un-

reasonable to require a multitude of search protocols from which prisoners could choose, and since the presence of undetected weapons, drugs and contraband within a prison, and within SHU, would be of great danger to the entire prison community. And, third, there are no reasonable alternatives to the prison regulation at issue herein. *See Covino*, 967 F.2d at 79. Plaintiff attempts to present alternative methods of search, but those have not been shown to be as effective, or more effective than those currently implemented in the prison, and, as noted above, the current requirement is that inmates, upon admission to SHU, undergo **both** a strip frisk **and** a search via hand-held metal detector or B.O.S.S. chair search. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 302.1(a). Thus, Plaintiff's argument on that point is defeated, since a chair search is only one step of several required methods.

Although the second *Safley* factor weighs in favor of Plaintiff, since there are no "alternative means of exercising the right in question that remain open to prison inmates" when entering SHU, overall, as set forth by this Court, Plaintiff has failed to carry his burden and has failed to show that the challenged regulation and policy, and the search in question here, which was performed in a separate "frisk room" (*see* Amended Complaint (Dkt. No.

---

**7.** Although the Court has not seen a report pursuant to Directives 4004 or 4944 concerning use of physical force under Directive 4910, the Court does not find such reports to have been necessary. The alleged hand on Plaintiff's shoulder or neck, alone, does not appear sufficient to require a report pursuant to Directives 4004 or 4944. *See* Directive 4910(III)(G)(4)(b) & (e) (Dkt. No. 67, Ex. 1). Again, Plaintiff does not allege that the officers touched any other part of his body (such as Plaintiff's buttocks or testicles), while Plaintiff does allege that the officers directed Plaintiff to manipulate parts of his own body,

as required (*see* Directive 4910(III)(G)(3)(b)), so that the strip frisk could be completed. Thus, the physical force, if any, was minimal, and only used to start the procedure in having Plaintiff turn around and face a wall. *See* Amended Complaint (Dkt. No. 9) at ¶ 2. It was not required to be "used to complete the strip frisk", which is the type of force for which a report must be filed pursuant to Directives 4004 or 4944 (such as where Directive 4910 provides procedures for when an officer spreads an inmate's buttocks for inspection). *See* Directive 4910(III)(G)(4)(b), (d) & (e) (Dkt. No. 67, Ex. 1).

9) at ¶ 2), was unreasonable or unconstitutional. Therefore, based upon the foregoing, and based upon this Court's prior reasoning and the reasoning contained in Judge Peebles' Report–Recommendation, Plaintiff's Motion for summary judgment remains denied, and Defendants' Motion for summary judgment remains granted.

### D. Qualified Immunity

 The Court now turns to Defendants' claim of qualified immunity, which the Court will address as it relates to Plaintiff's claims of constitutional violations stemming from the strip frisk/search. Qualified immunity shields official actors from civil liability, except where they have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir. 1995) (Cardamone, J.) (internal quotation marks omitted; citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "This protection turns on the ' "objective legal reasonableness" ' of the allegedly unlawful official action 'assessed in light of the legal rules that were "clearly established" at the time it was taken.' " *Rodriguez,* 66 F.3d at 475 (citing and quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow,* 457 U.S. at 818–19, 102 S.Ct. 2727)). When evaluating qualified immunity, " 'the better approach . . . is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question.' " *Lauro v. Charles,* 219 F.3d 202, 206 (2d Cir.2000) (Calabresi, J.) (citing and quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); and citing *Wilson v.*

*Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

In determining whether a right was clearly established at the time defendants acted, we examine whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful.

*Rodriguez,* 66 F.3d at 476 (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

Individuals do have a clearly established right to be free from unreasonable seizures under the Fourth Amendment, and a right to due process of law. *See* U.S. CONST. amend. IV. But, although said rights were firmly established at the time Plaintiff was searched prior to entering SHU, and although the Fourteenth Amendment made the Fourth Amendment applicable to the several States, *see Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (Kearse, J.) (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)), the prison setting provides exceptions to an absolute application of this constitutional jurisprudence. Indeed, *Covino* itself acknowledges a lessened right to bodily privacy—although not a complete relinquishing of said right. *Covino,* 967 F.2d at 77–78.

Given the discussion in Section II.C of this decision, *supra,* although there is a clearly established constitutional right against unreasonable searches and seizures, Plaintiff's right is lessened in the prison setting, and in this matter that limited right is further shown to be subject to the reasonable and justifiable prison regulation, policy, and search. The strip frisk/search, and Defendants' actions in this

matter were not unreasonable or unconstitutional, and thus under the law both at the time and currently, it is clear that Defendants would not have reasonably understood that their actions were unlawful, nor would another reasonable official in the same position have determined said actions to have been unlawful in the given situation. Even if a constitutional deprivation had occurred, Defendants are shielded by qualified immunity in this matter. *See, generally, Narcato,* 363 F.Supp.2d at 497–498.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED,** that Defendants' Motion for Summary Judgment (Dkt. No. 44–1) remains **GRANTED,** and Plaintiff's Motion for summary judgment (Dkt. No. 41–1) remains **DENIED;** and it is further

**ORDERED,** that this Memorandum–Decision and Order responds to the Mandate from the United States Court of Appeals for the Second Circuit (Dkt. No. 65), and the parties may now present this Order to the Court of Appeals in seeking further review, as desired, pursuant to said Mandate (Dkt. No. 65, at 3); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**